# EXHIBIT DISPLAY
## AND
# TRADE SHOW
# AGREEMENT

### APRIL 1, 1998 - MARCH 31, 2001



### SIGN, DISPLAY AND ALLIED CRAFTS

### LOCAL UNION NO. 510

### SAN FRANCISCO BAY AREA

# TRADE SHOW AND CONVENTION DECORATOR AGREEMENT

THIS AGREEMENT entered into as of April 1st, 1998, by and between the Trade Show and Convention Decorator employers (the "Employers") hereinafter referred to as the Employer, and Sign Display and Allied Crafts Local Union No. 510 (the "Union") affiliated with the Brotherhood of Painters and Allied Trades, AFL-CIO, hereinafter referred to as the Union.

## WITNESSETH

For and in consideration of harmonious relations and the maintenance of settled conditions in the Trade Show and Convention Industry; for the stabilizing of the standards thereof; for the peaceful adjustment of any disputes or grievances that may arise from time to time, and other mutually beneficial relations, the parties hereto have agreed individually and collectively.

**ARTICLE I.       JURISDICTION.**

A. Sign, Display and Allied Crafts Union No. 510 shall have sole jurisdiction over the following work done by the Employer: (1) the installation and removal of all exhibits (floor-to-ceiling) and related materials in connection with trade shows and conventions, including, but not limited to: (a) trade show and convention booth assembly and disassembly; (b) installation and removal of interior and exterior decorations, flags, drapes, and other display materials, specialty furniture, theme areas, modular systems and other display materials; and when assigned to employees covered by this Agreement, operation of mechanical lifts, installation and operation of chain motors and trusses for sign and display material, shall be performed by Installers JATC trained and accredited as riggers;(c) uncrating, assembly, installation, removal, disassembly, and re-crating of all commercial exhibits; installation, dismantling of furniture owned by the Employer, installation and removal of floor coverings and special event displays; and (2) driving of trucks of a maximum capacity of one and one-half tons in the delivery and/or installation and/or removal of the above work.

B. 1. The Union shall also have sole jurisdiction over the following work done by the Employer: (1) the construction, preparation, erection, and maintenance of all signs, lettering, pictorial work, screen process work, show card writing, commercial exhibits and fabrication of advertising displays and (2) pattern and sketch making, scale model making, the preparation of training aids and mockups and application of plastic scotchlite, and similar reflective materials.

1

K. On show opening days or when staggered shifts are needed an employee may be required to work six (6) consecutive hours before being entitled to a mandatory one hour meal break.

L. Notwithstanding any other provisions of this Agreement the Employer shall not regularly or normally work any employee more than twelve hours in any workday or be required to grant less than eight hours rest to any employee between shifts.

M. Installers employed in an Employers shop or warehouse as a builder, when such Employer is signatory to the Builders Agreement, shall be subject to Article XVII, Hours and Overtime of such Agreement while employed in such capacity.

### ARTICLE XV.   TOOL SECURITY.

The Employer shall provide locking tool cages at the job site whenever possible for the storage of employees personal tools. When locking tool cages cannot be provided the Employer shall use its best effort to provide a reasonably secure area for personal tool storage. Garment racks shall be provided when practical. All tool and garment storage shall be at the employees own risk.

### ARTICLE XVI.   MEDICAL PROGRAM.

A. The medical program for installers is composed of a Medical, Vision, Prescription, Dental and Life insurance program.

1. Each Employer signatory to this Agreement shall pay into the Sign, Pictorial and Display Industry Medical Program for each hour paid or owed by installers covered by this Agreement, effective, May 1, 1998 (5 cent increase), $4.62; Effective May 1, 1999, (33 cent increase) $4.95. Employer contributions shall not exceed these amounts during the term of this Agreement.

B. Payments are due and payable into the Medical Program between the first and fifteenth day of each month, provided that the Employers receive the necessary forms and data on or before the first of the month.

C. Said Medical Program shall be administered in accordance with the provisions of the Trust Agreement adopted by the parties hereto and by any amendments thereto.

16

### ARTICLE XVII.   PENSION PROGRAM.

A. Each Employer signatory to this Agreement shall pay into the Sign, Pictorial and Display Pension Program for each hour paid or owed for employees covered by this Agreement, May 1, 1998 increased pension contributions of $.50 to $1.90; May 1, 1999 of $.25 to $2.15; May 1, 2000 increased contribution of $.50 to $2.65. Payments to the Fund shall not exceed the amount listed for the life of the Agreement.

B. Payments are due and payable into the Pension Program between the first and fifteenth day of each month, provided that the Employers receive the necessary forms and data on or before the first of the month.

C. The Sign, Pictorial and Display Pension Program shall be administered in accordance with the provisions of the Trust Agreement adopted by the parties hereto and by any amendments thereto, and each Employer signatory to this Agreement agrees to be bound by all of the terms and conditions of said Trust Agreement and any amendments thereto now in force or hereafter adopted.

### ARTICLE XVIII PAYMENT OF FRINGE BENEFITS.

A. DUE DATES. Each Employer shall submit to the Trust Fund Administration Office payment contributions along with a monthly fringe benefit remittance form, showing the hours worked by its employees during the preceding month or stating that it had no employees. Each Employer shall simultaneously submit a copy of its monthly fringe benefit remittance form to the Union. In order to be timely, fringe benefit contributions must be received by the Administration Office on or before the fifteenth (15th) day of the month following the month when the work was performed by employees of Employers whose principal place of business is located within the State of California and on or before the twentieth (20th) day of the month following the month when the work was performed by employees of Employers whose principal place of business is located outside the State of California.

B. DELINQUENT PAYMENTS. In respect to all fringe benefit payments, time is of the essence. The parties hereto recognize and acknowledge that the regular and prompt payment of fringe benefit contributions by each Employer to the Trust Funds is essential to the maintenance in effect of the various Funds and Plans involved, and that it would be extremely difficult, if not impossible, to fix the actual expense and damage to the parties hereto and to the Funds and Plans which would result from the failure of an Employer to make the monthly payments in full within the time provided. Therefore, it is agreed that the amount of damage to each said Fund and to the parties hereto resulting from any such failure shall be, by way of liquidated damages and not as a penalty, the greater of $200 or ten percent (10%) of the amount due and unpaid, or as otherwise determined by the Trust Funds. Such liquidated damages shall become due and

17

payable to the Trust Funds on the day immediately following the day on which the Employer become delinquent. In addition, all delinquent contributions and liquidated damages shall bear interest at the rate of ten percent (10%) per annum, from the date each was due, until paid. If any Employer defaults in the payment of any contributions due to the Trust Funds, then in addition to the fringe benefit contributions, liquidated damages and interest provided herein, said Employer shall pay all reasonable collection expenses incurred by the Trust Funds, including but not limited to arbitration fees, costs of collection agents, auditing fees, accountants' fees, court costs, and reasonable compensation expenses and costs, attorneys' fees, costs of attachment bonds, all legal for employees or agents of the Trust Funds incurred in connection therewith.

C. **EMPLOYER RESPONSIBILITY.** In addition to all other remedies, if an Employer is delinquent in the payment of fringe benefit contributions and, consequently, an employee is denied benefits, said Employer shall pay for the health benefits which would have been provided for its employees but for said delinquency.

D. **WITHDRAWAL OF EMPLOYEES.** It shall not be a violation of this Agreement for the Union, after receiving notice from the Administration Office that an Employer is delinquent in the payment of fringe benefit contributions, to withdraw employees working under this Agreement from the job or jobs of said delinquent employer or to refuse to furnish employees to said delinquent Employer until full payment has been made. Before withdrawing employees pursuant to this paragraph, the Union must give said Employer seventy-two (72) hours notice by certified mail. Each employee so withdrawn shall continue to receive from said delinquent Employer full wages and fringe benefits due for a maximum of three (3) days, in addition to all wages and fringe benefits up to a time actually worked prior to the withdrawal from the job. No employee will be disciplined as the result of leaving the jobsite of a delinquent Employer. The action of withdrawing employees from the job must be uniformly enforced on all delinquent Employers; if it is not uniformly enforced, this paragraph shall be null and void.

E. **RIGHT TO AUDIT.** Upon notice in writing from the Trust Funds or an authorized agent thereof, each Employer shall permit any accountant appointed by the Trust Funds to enter upon its premises during business hours, at all reasonable times, and to examine and copy such books, records, and documents of such Employer as may be necessary to determine whether the Employer is making full and prompt payment of all sums required to be paid by this Agreement.

F. **DOCUMENTS FOR AUDIT.** The Employer understands that the purpose of the audit is to determine how much money, if any, is owed under the terms of this Agreement. The Employer further understands that the purpose of the audit would be defeated if it were able to limit the audit in any way, including limiting the audit to the employees whom the Employer defines as covered

18

employees. Therefore, the Employer shall not limit the scope of the audit in any fashion, but must make available to the Trust Funds, upon request, all of the following books and records maintained by the Employer. The parties agree that the following documents are necessary for the completion of an audit pursuant to this Agreement: the Employer's quarterly tax returns to the state and federal government including California Forms DE-6 and IRS Forms 941; payroll journals, individual earnings records and time cards for all employees; general check registers; reports of employees hours to all trade unions and to all employee benefit plans; and workers compensation insurance reports for all employees. Upon the accountant's certification that further documents are necessary to complete an audit, the Employer shall be required to produce any of the following documents as specified by the accountant and approved by the Trust Funds: general ledgers; bank statements; canceled checks; IRS Forms W-2, W-4, 1096 and 1099; cash receipts journals; financial statements; invoices; contracts; federal and state income tax returns; and any other records which the accountant deems necessary or relevant to complete the audit.

G. **COST OF AUDIT.** The entire cost of the audit shall be borne by the Employer if the audit reveals that the Employer paid fringe benefit contributions which were less than the amount due, by at least ten percent (10%) of all contributions due for the period covered by the audit. Any Employer who cancels an audit without at least two (2) working days notice, or who fails to provide the required documents, shall be liable for the costs caused by that delay or that failure whether or not the audit reveals any contributions due. If an employer refuses the accountant entry for purposes of an audit, the Trust Funds may take legal action to compel entry, without regard to any grievance or arbitration procedure in this Agreement; and the Employer shall pay all reasonable costs and legal fees incurred by the Trust Funds in compelling or obtaining such an audit. In the event that an audit is performed outside the State of California, the Employer shall pay all costs incurred by the Trust Funds' accountant for transportation, meals and lodging in connection with the audit.

H. **PAY DAYS.** Employees shall be paid on a weekly basis, on the same day each week. If an employee is not paid his wages within three (3) days of the regular pay day, then in addition to all other available legal remedies, the employee shall receive from the Employer $25 per day for each day until all wages are paid, up to a maximum of $150. It shall not be a violation of this Agreement for any employee to refuse to work for any Employer who has not paid all wages due within three (3) days of the regular pay day.

I. **TERMINATION NOTICE.** In addition to giving written notice of termination or modification as set out in Article XXVI herein, an Employer desiring to terminate the Collective Bargaining Agreement shall also give notice of termination to the Fringe Benefit Trust Fund Administrator, at least sixty (60) days prior to the last effective date set out in this Agreement, or the last day of January of any succeeding year, (60 days notice) of the desire to terminate or modify this Agreement in order that the Fringe Benefit Trust Funds may have

19

knowledge of such notice on the part of the Employer.

J. ACKNOWLEDGEMENT OF RECEIPT. The parties hereby acknowledge that the Employer has received copies of, and agrees to be bound by all Declarations of Trust, as amended, establishing each of the several Fringe Benefit Trust Funds set out in this Agreement.

ARTICLE XIX.   VISITS TO ESTABLISHMENTS.

It is agreed by the parties hereto, that for the purpose of the carrying out and enforcing the terms of this Agreement, the Business Representatives of the Union, or a properly accredited representative of the International Brotherhood or Local Union, shall have the right of visiting and entering the establishment of the Employer to interview workers. The Union representative shall enter Employer premises by the front door and shall notify the owner or manager or (if neither is available) some other non-bargaining unit employee prior to proceeding to the work area.

ARTICLE XX.   LABELS.

The label of Local Union No. 510 shall be placed on each finished piece of display work in such a position as may be mutually agreed. Each shop shall have two Union Label Stamps and additional stamps as necessary to be purchased from the Union for exact cost per stamp.

ARTICLE XXI.   CONTRACT ENFORCEMENT.

A. The Union agrees to immediately take all steps to enforce the terms and conditions of this Agreement upon all Employers engaged in any of the classifications of work covered by this Agreement.

B. The Union further agrees to immediately take all steps to prevent the installation of displays and/or exhibits in any shows or conventions located within the jurisdiction of the Union, by other than employees of the Employers signatory to this Agreement. The Employer agrees to notify its clients of the Union's jurisdiction over the work of the classifications defined in this Agreement. A copy of such notice shall be sent to the Union.

C. There shall be no strike or lockout during the term of this Agreement.

ARTICLE XXII.   INSURANCE.

The Employer shall carry compensation insurance against accidental injuries to employees as provided by the laws of the State.

20

ARTICLE XXIII.   NOTIFICATIONS.

A. Each Employer signatory to this Agreement agrees to notify the Union of any new hires within three (3) days of the payday immediately following hire.

B. The Union agrees and it shall, upon the execution of this Agreement, notify its members of the provisions thereof, and shall thereafter discipline any of its members found guilty of the violation of the goodwill and cooperation of this collective bargaining Agreement.

C. Whenever possible each Employer signatory to this Agreement shall notify the Union of all bookings or scheduling of shows by the 15th of the month prior to the month for which said show is scheduled. All shows with two hundred (200) or more booths should have a pre-job conference whenever possible. When a thirty (30) day notice is not possible the Employer, in any event, shall notify the Union of all shows in Local 510 jurisdiction.

ARTICLE XXIV.   CHANGE OF OWNERSHIP.

A. This Agreement, and any supplements or amendments thereto, hereinafter referred to collectively as "Agreement," shall be binding upon the parties hereto, their successors, administrators, executors, and assigns.

B. In the event the Employer fails to require the purchaser, transferee, or lessee to assume the obligations of this Agreement, the Employer (including partners thereof) shall be liable to the Union, and to the employees covered for the terms of this Agreement for all damages sustained as a result of such failure to require assumption of the terms of this Agreement, but shall not be liable after the purchaser, transferee, or lessee has agreed to assume the obligations of this Agreement. The word "damages" in this paragraph means any loss of wages or fringes sustained by an employee or the Union due to the Employer's failure to abide by the provisions of this paragraph.

ARTICLE XXV.   JOINT APPRENTICE AND TRAINING COMMITTEE.

Effective May 1, 1998 the Employer agrees to contribute eight cents ($0.08) per hour to a Trust Fund for a Training Program for A, B and C. List installers. The JATC shall select and employ a Training Coordinator as required. Such individual shall take direction from and be responsible to the JATC.

All B List installers shall be required to complete the Training Program established by the Joint Apprentice and Training Committee before being allowed to go onto the "A" List.

A. The JATC and the Health & Safety Committee shall consist of Four Employer appointed Trustees, who each shall maintain an employment relationship with an Employer signatory to this two part Agreement, and four

21

Union appointed Trustees, three of whom shall be Business Representatives of Local 510 and one of whom, shall be a rank and file member of Local 510.

B. Each Employer shall verify with the steward that all new hires are capable of safely operating all power tools and are familiar with all safety regulations.

1. The Committee shall hold regular meetings quarterly and may meet in executive session as they deem necessary;

2. Prepares and makes available to the affected employees, written records of the safety and health issues discussed at the committee meetings and, maintained for review by the CAL OSHA upon request;

3. Reviews results of the periodic, scheduled worksite inspections;

4. Reviews investigations of occupational accidents and causes of incidents resulting in occupational injury, occupational illness, or exposure to hazardous substances and, where appropriate, submits suggestions to management for the prevention of future incidents.

5. Reviews investigations of alleged hazardous conditions brought to the attention of any committee member. When determined necessary by the committee, the committee may conduct its own inspection and investigation to assist in remedial solutions;

6. Submits recommendations to assist in the evaluation of employee safety suggestions;

7. Upon request from the CAL OSHA, verifies abatement action taken by the employer to abate citations issued by the CAL OSHA.

Disputes will be settled through the Grievance Procedure, Article VIII. The Employer will be responsible for implementing and enforcing safety rules.

Health & Safety policies will be established by this Committee for the Industry.

Two cents ($0.02) of the eight cent ($0.08) contribution shall go to the IBPAT Labor Management Fund and one cent ($0.01) to the IBPAT National Apprentice Fund at the discretion of the JATC Trustees but not before January 1, 1999.

All newly hired apprentices and helpers shall be required to complete the Training Program established by the Joint Apprentice and Training Program for installers within the first year of employment.

22

C. The JATC shall maintain a current list of an adequate number of trained and accredited riggers. Such list shall be distributed to the designated operations manager of each Employer. The Employer shall only use JATC trained and accredited riggers when performing a rigging function with employees covered by this Agreement.

D. Any dispute the Trustees are unable to resolve will be submitted to an independent arbitrator for final and binding arbitration. The arbitrator will be selected by the JATC trustees and the costs of the arbitration will be paid by the JATC fund. The Fund will not pay any attorney fees, and attorneys will not be employed to argue the dispute.

The Drug and Alcohol Policy in effect shall remain in effect. In the event either party is not satisfied with a decision of the JATC, the matter may be appealed through the Grievance and Arbitration Procedure.

ARTICLE XXVI.     TERMINATION OF CONTRACT.

A. The understanding shall be the basis of the working Agreement between the two principals above-mentioned for a period beginning April 1st, 1998, to March 31, 2001, and shall continue in full force and effect from year to year, except as hereinafter specified, unless terminated, amended, rewritten or cancelled, by either party serving notice in writing sixty (60) days previous to the expiration day, at which time the principals hereto shall notify each other, of any changes requested.

B. In the event that negotiations extend beyond the date of expiration of this Agreement, the terms of the present Agreement shall remain in effect until a new Agreement is signed and any alterations in wages, hours and working conditions shall be retroactive to the date of expiration.

23

## ARTICLE XXVII.   SEPARABILITY CLAUSE.

In the event that any of the provisions of this Agreement shall be said to be in violation of any state or federal law or regulation, such determination shall not in any way affect the remaining provisions of this Agreement.

FOR THE UNION

SIGN, DISPLAY AND ALLIED CRAFTS LOCAL UNION NO. 510

SIGNATURE: _____  DATED: April 1, 1998

Michael E. Anderson

FOR THE EMPLOYER

COMPANY: Pacific Convention Services Inc

SIGNATURE: Susan Rogers    DATED: 5/1/98

PRINT NAME: SUSAN ROGERS

MEH/eb-opeiu-3-afl-cio(147)

24

---

## SIGN, DISPLAY & ALLIED CRAFTS LOCAL 510
## EMPLOYMENT OFFICE PROCEDURES FOR INSTALLERS

Location of Employment Office.  Sign, Display & Allied Crafts Local 510, hereinafter called the "Union" shall maintain an employment office, presently at 2660 Newhall Street, San Francisco, CA.

Purpose of Employment Office.  The purpose of the employment office is to enable the Union, pursuant to its obligations under its collective bargaining Agreements, to furnish skilled and competent workers when requested to do so by an Employer.

Financing of the Employment Office.  It is recognized that the operation of the employment office entails considerable expense to the Union.  Members of the Union contribute to that expense through their Union dues.  Since the employment office is available to members and non-members on an equal basis, justice requires that non-members contribute their fair share, estimated to be fifty dollars ($50.00) per year, by payment of a registration fee in that amount.  The registration fee shall be payable by March 1st of each year, or by the first day a person may be eligible to register with the employment office, whichever comes later.  The registration fee may, at the option of the registrant, be credited toward his initiation fee into the Union.

Non-Discriminatory Standards.  In carrying out the registration and dispatch procedures set forth below, the Union shall not discriminate either in favor of or against any individual by reason of his or her race, sex, creed, color, age, or national origin; nor shall the registration or dispatch of any individual be based upon, or in any way be affected by, Union membership, by-laws, rules, regulations, constitutional provisions, or any other aspect of Union membership, policies or requirements, except to the extent that membership in the Union, or after the thirtieth (30th) day following the beginning of employment, shall be a condition of employment.

Registration.

A. Facilities.  The Union shall maintain adequate registration facilities at the employment office.

B. Seniority.  The Union shall maintain the following registration lists:

1. List A (Journeypersons) - For individuals who worked a minimum of 500 hours required to make the A List for Employers signatory to collective bargaining agreements with the Union.  These workers shall be listed in the order of their seniority as determined by the Union's Seniority Regulations.

25